IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DANA H. HODGDON, | ) |
| | ) |
| Plaintiff, | ) No. 06 C 5399 |
| | ) |
| v. | ) |
| | ) |
| NORTHWESTERN UNIVERSITY, | ) Magistrate Judge Jeffrey Cole |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Professor Hodgdon's four-count complaint alleges that his former employer, Northwestern University, discriminated against him in violation of the Americans with Disabilities Act of 1990 ("ADA"), and retaliated against him in violation of both that statute and the Family Medical Leave Act of 1993. The complaint states that in September 2004 Professor Hodgdon requested – and the University approved – a "medical leave of absence" for an "illness" of "unknown etiology." (Complaint at ¶9 and Exhibit A, Charge Of Discrimination, at 1). Although the complaint does not amplify on the nature or manifestations of the illness, the University's supplemental submission–which has not been disputed--demonstrates that the illness was significant. (Letter of May 23, 2007 from Peter G. Land to the Court at 3).[1]

The leave was extended into February of the following year, at which time, having allegedly

---

[1] This cryptic allegation in the complaint is consistent with the pleading requirements in the Seventh Circuit – at least prior to *Bell Atlantic Corp. v. Twombly, et al.*, _ U.S._, 127 S. Ct. 1955 (May 21, 2007). See *Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 714 (7th Cir. 2006). It is for discovery to uncover out the details. *Id.* It is that very discovery to which Professor Hodgdon objects.

"recovered from his illness," Professor Hodgdon informed the University that he was ready to return to his teaching duties. (*Complaint*, ¶¶ 11-13). The University requested, and Professor Hodgdon provided, proof in the form of a terse letter from his internist that he was "in good health" and could return to full time work. (*Id.*, ¶¶ 15-17). The University apparently did not deem the two sentence letter sufficiently informative. (*Answer* to ¶ 15-17). Consistent with what the University claims is its policy, of which Professor Hodgdon was aware, the University required Professor Hodgdon to submit to a physical and psychological examination prior to his being allowed to return to work; he reluctantly complied – at least partially. (*Id.*, ¶¶ 18-20, 24-28; *Answer* to ¶¶ 12, 19-20).

He balked, however, at signing a release for his medical records relating to the illness that required the leave of absence. (*Id.*, ¶¶ 11, 29). The controversy was apparently fueled in part by Professor Hodgdon's questioning the "accuracy of letters from his own physician, upon which the University based its request for the" medical evaluation. (*See Defendant's Opposition to Plaintiff's Motion*, Ex. A at 2).

The complaint alleges that the Multi-Disciplinary Assessment Program that the University insisted Professor Hodgdon undergo was an illegal, "intrusive and excessive evaluation process," as was the request for the medical records relating to Professor Hodgdon's leave of absence. (Complaint at ¶¶ 19-22). When the University refused to allow him to return to teaching, placing him instead on unpaid medical leave, Professor Hodgdon stood his ground and left the University for a "temporary" position at DePaul University. (*Id.*, ¶¶ 32-33).

Count I of the complaint, captioned "Illegal Demand For Medical Assessment in Violation Of The Americans With Disabilities Act," alleges that the University's conduct violated, *inter alia*, 42 U.S.C.§ 12112(d)(4), which provides that "[a] covered entity shall not require a medical

examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." The complaint alleges that as a result of the University's conduct–which is alleged to have been willful – the plaintiff has lost wages and other benefits, suffered embarrassment and humiliation, unnecessary emotional distress and suffering, and irreparable damage to his career and reputation. (Complaint, ¶¶ 36, 40, 41).

Count II is captioned "Discrimination in Violation of the ADA." It correctly states that the ADA makes it unlawful to discriminate against an employee on the basis of an employee's disability, a record of disability or because the employer regards the employee as having a disability. (¶ 43). *See also* 42 U.S.C. §12102 (2).[2] The count concludes by alleging that the willful conduct-- as adumbrated in paragraphs 1 through 36, which are incorporated by reference-- constitutes discrimination in violation of the ADA.

Counts III and IV add claims of willful retaliation in violation of the ADA and FMLA.

The Complaint concludes with a request for relief in the form of reinstatement to a position equal to or greater than the plaintiff's former position, past and future compensation and benefits lost as a result of the University's willful discrimination, and punitive damages. (Complaint, at 8).

During the course of discovery, the University served subpoenas on certain of Professor Hodgdon's healthcare providers, seeking medical records relating to the illness that required his

---

[2] While titles of pleadings are not conclusive, *Whitaker v. Superior Court*, 514 U.S. 208, 209 (1995); *Bartholet v. Reishauer A.G.*, 953 F.2d 1073, 1078 (7th Cir. 1992); *cf. Parmellee Transportation Co. v. Keeshin*, 292 F.2d 749, 804 (7th Cir. 1961), *cert. denied*, 365 U.S. 944 (1962), they are not valueless, and in this case, the substance of the count is accurately reflected in the title.

medical leave of absence and on his current employer, DePaul University, seeking records regarding his recruitment, hiring, and course of his employment. Professor Hodgdon has moved to quash the subpoenas and has sought a protective order prohibiting the University from seeking medical information or contacting DePaul.

The Motion to Quash and for Protective Order did not cite a single case.[3] It was, however, rich in conclusions and allegations of impropriety. Thus, for example, it contended that the discovery was in violation of Professor Hodgdon's "clear protection under the law" (Motion at ¶ 4), and that the inquiry into his medical history is "overbroad, irrelevant, unduly intrusive and not designed to lead to the discovery of admissible evidence. . . ." (*Id.* ¶ 12).[4] Its sole purpose, the motion contended, was "to pry into Plaintiff's medical condition and to harass, intimidate and embarrass Plaintiff" (*id.*) and to "circumvent the statute and the entire purpose of the litigation." (*Id.* ¶ 14). The motion also contained the *ipse dixit* that the records from DePaul were irrelevant to any issue in the case and that the purpose of the discovery was "simply a ploy to harass, intimidate, annoy and embarrass Plaintiff. . . ." (*Id.* ¶ 25).

The Motion is based on an excessively narrow view of what constitutes relevant evidence under the Federal Rules of Civil Procedure and a studied avoidance of what is alleged in the complaint.

---

[3] Skeletal presentations, unsupported by any case law, are impermissible. *See Culver v. Gorman & Co.*, 416 F.3d 540, 550 (7th Cir. 2005). For reasons that lie at the core of our adversary system, it is not a court's responsibility to research and support a party's arguments. *United States v. McLee*, 436 F.3d 751, 760 (7th Cir.2006).Professor Hodgdon's presentation was amplified in his reply brief, but that support ought to have been included in the opening brief. *Carter v. Tennant Co.*, 383 F.3d 673, 679 (7th Cir.2004); *Hussein v. Oshkosh Motor Truck Company*, 816 F.2d 348, 360 (7th Cir.1987) (Posner, J., concurring).

[4] These sorts of boilerplate objections are meaningless and insufficient under Rule 33(b)(1) and (4). *See Josephs v. Harris Corp.*, 677 F.2d 985, 992 (3rd Cir. 1982)

4

## ANALYSIS

There was a time when "[t]o require the disclosure to an adversary of the evidence that is to be produced would be repugnant to all sporstmanlike instincts." 6 Wigmore, Discovery § 1845 at 490 (3rd Ed.1940). Indeed, the common law's sporting theory of justice permitted the litigant to reserve evidential resources (documents and witnesses) until the final moment, marshaling them at the trial before his surprised and dismayed antagonist. It did not openly defend or condone trickery and deception; but it did regard "the concealment of one's evidential resources and the preservation of the opponent's defenseless ignorance as a fair and irreproachable accompaniment of the game of litigation." *Id. See also* 8 Wright, Miller & Marcus, Federal Practice & Procedure: Civil 2d § 2001 at 40 (1994).

Today's attitude towards discovery is vastly different. Contrary to the common law's approach, contemporary thought has concluded that secrecy is not congenial to truth-seeking, and that trial by ambush is incompatible with the just determination of cases on their merits. *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002); *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 253 (1978) (Powell, J., concurring and dissenting); *Hickman v. Taylor*, 329 U.S. 495, 500 (1947); Rule 1, Federal Rules of Civil Procedure. By requiring comprehensive disclosure of relevant information, the Federal Rules of Civil Procedure seek to avoid the surprise and secrecy that are antithetical to the informed determination of cases of their merits. *Cf., Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512-13 (2002). *See also American Floral Services, Inc. v. Florists Transworld Delivery Ass'n*, 107 F.R.D. 258, 260 (N.D.Ill.1985) (Shadur, J.).

As expansive as is the definition of relevancy under Rule 401 of the Federal Rules of Evidence, *United States v. Murzyn*, 631 F.2d 525, 529 (7th Cir.1980); *United States v. Marks*, 816

F.2d 1207, 1211 (7th Cir.1987), the standard under Rule 26 is even broader. *Hofer v. Mack Trucks*, 981 F.2d 377 (8th Cir.1992). Under Rule 26(b)(1), "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the claim or defense of any party." At the same time, however, under Rule 26(c), the court may enter an order "for good cause shown . . . to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." This puts the burden on the party seeking the protective order to show some plainly adequate reason for its issuance. *Jepson, Inc. v. Makita Elec. Works, Ltd.*, 30 F.3d 854, 858 (7th Cir. 1994); 8 C. Wright & A. Miller, Federal Practice and Procedure § 2035, p. 265 (1970).

Courts have insisted on a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements, in order to establish good cause. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n.16 (1981); 8 C. Wright & A. Miller, Federal Practice and Procedure § 2035, p. 265 (1970). Upon such a showing, the court may enter an order that provides "that the disclosure or discovery not be had" or that it be had on specified conditions. Rule 26(c)(1). Similarly, the party seeking to quash a subpoena under Rule. 45(c)(3)(A) has the burden of demonstrating that the information sought is privileged or subjects a person to an undue burden.[5] *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 993 (7th Cir. 2002).

### A.
### COUNT I AND THE MEDICAL RECORDS

The Reply brief ominously predicted that if the medical records relating to the six-month leave are ordered produced, § 12112(d)(4) of the ADA, which underlies Count I, will be rendered

---

[5] Professor Hodgdon does not specify under what subsection of Rule 45 he seeks to quash the subpoenas at issue, but only (iii) or (iv) would appear to be applicable. There has been no claim by the recipients of the subpoenas that compliance would constitute an undue burden.

"'nugatory.'" (*Reply Brief,* at 2). Professor Hodgdon's argument runs this way: since the permissibility of testing under 42 U.S.C. 12112(d)(4)(A) is to be determined by objective standards at the time of the request, and since he need not prove he is disabled in order to invoke the protection of (d)(4), the medical records are irrelevant. As Justice Frankfurter said in another context, "this is a horse soon curried." *Olberding v. Illinois Central Railroad,* 346 U.S. 338, 340 (1953).

Professor Hodgdon was admittedly unable to work for six months – as a consequence of an illness that by any standard cannot be deemed insignificant. It would seem odd, indeed, if the University did not have the right to confirm the accuracy of Dr. Oh's conclusion that all was well given its laconism and the "biases that a treating physician may bring to the disability evaluation." *Dixon v. Massanari* 270 F.3d 1171, 1177 (7th Cir.2001). *Accord Hofslien v. Barnhart,* 439 F.3d 375, 376-77 (7th Cir.2006)(Posner, J.)(discussing the willingness of treating physicians often to "bend over backwards to assist a patient in obtaining benefits."). Even in *Fredenburg v. Contra Costa County Department of Health Services,* 172 F3d 1176,1182 (9th Cir. 1999), on which Professor Hodgdon places substantial reliance, the court of appeals allowed the district court on remand to conduct such further proceedings and discovery as would illuminate the issue of whether the kinds of medical information the defendant had sought from the returning employee's examining doctor were job related and consistent with business necessity. 172 F.3d at 1183.

A number of courts have held that a plaintiff need not prove that he is "disabled" in order to challenge the scope of medical examinations under the ADA. *See e.g., Fredenburg ,* 172 F3d at1182; *Griffin v. Steeltek,* 160 F.3d 591 (10th Cir. 1998); *Roe v. Cheyenne Mountain Conference Resort, Inc.,* 124 F.3d 1221, 1229 (10th Cir. 1997); *Jackson v. Lake County,* 2003 WL 22127743 at* 9 (N.D.Ill. 2003 (Lefkow, J.). *Contra, Varnagis v. City of Chicago,* WL 361150

(N.D.Ill.1997)(Anderson, J.).

The Seventh Circuit in *Murdock v. Washington*, 193 F.3d 510 (7th Cir.1999) noted that §12112(d) "does not require that an individual be disabled to state a claim." *Id.* at 512. Three years later, the court made no reference to *Murdock* and said that it had not yet decided the issue. *See O'Neal v. City of New Albany*, 293 F.3d 998, 1007 (7th Cir.2002). The court did, however, stress that all the cases that had decided the question required that a nondisabled plaintiff at least show some tangible injury-in-fact caused by the § 12112(d) violation, and that while an impediment that would have prevented an applicant from getting the job in any event–in *O'Neal* it was age–would not bar a suit for discrimination, seeking damages for emotional distress, it would affect the remedy of "instatement" – and thus of reinstatement. 293 F.3d at 1004, 1007-1008.

Thus, because Professor Hodgdon need not prove under Count I that he suffers from an actual or perceived disability, does not mean that the medical evidence relating to his leave of absence is irrelevant. The question of causality and remedy must be considered – and they have been ignored by the plaintiff.

Count I seeks reinstatement to the same or greater position than the plaintiff enjoyed when his illness required him to take a six-month leave of absence. The medical records could not be more relevant to that remedy, which is equitable in nature and is granted only if appropriate. *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 301 (2002). If the plaintiff cannot "perform the essential functions of the employment position" to which he seeks reinstatement, 42 U.S.C. §12111(8), reinstatement, at least arguably, would not be an appropriate remedy. *Cf. O'Neal*, 293 F.3d at 1004 ("The magistrate judge was correct that O'Neal probably cannot now be instated as a New Albany police

officer [because he was too old]. . . .").[6]

Whether ability to do the job one seeks or holds be viewed from the vantage point of the claim or the defense, the evidence sought in this case is relevant to the demand for reinstatement. A contrary conclusion would require a construction of the Act that, in effect, thwarts the statutory scheme by negating one of the ADA's core provisions, namely that a plaintiff must be able to perform "the essential functions" of the desired employment position. *See* 42 U.S.C. §§12111(8), 121111(12)(b)(5)(A)-(B). Such a construction would run afoul of the sound principle that absurd, nonsensical or unreasonable constructions weigh against the interpretation contended for. *Cf. Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 289 (7th Cir. 2005) (Posner, J.); *Matter of Lifschultz Fast Freight Corp.*, 63 F.3d 621, 625 (7th Cir. 1995); *Central States, Southeast & Southwest Areas v. Lady Baltimore Foods, Inc.*, 960 F.2d 1339, 1345 (7th Cir. 1992)(Posner, J.).

Count I also charges that as a result of the University's conduct Professor Hodgdon has lost wages and benefits, suffered humiliation, unnecessary emotional distress and irreparable damage to his career and reputation. (*Complaint*, ¶ 37). The requested medical records are relevant to all three allegations. If the evidence were to demonstrate that Professor Hodgdon would have been unable to perform "the essential functions" of his job at the University, that arguably would impact any entitlement to any claim for back pay. Further, the claim of severe and unnecessary emotional suffering makes the medical evidence relevant. *Doe v. Oberweis Dairy*, 456 F.3d 704, 718 (7th Cir.

---

[6] The Court of Appeals noted that Title VII provides for more than "instatement" as a remedy for those who suffer race discrimination. The plaintiff could still seek damages for the humiliation and emotional distress he claims to have suffered as a result of the defendants' discriminatory actions. It also noted that while O'Neal might be entitled to some back pay even though he could not be hired, it was because there was a brief time when his age was not a disqualifying factor. There is no comparable factor at play here.

2006). [7] The University is entitled to show that there were other causes for the claimed distress, *Calder v. TCI Cablevision of Missouri Inc.*, 2001 WL 991459 (E.D. Mo. 2001); *cf., Deloughery v. City of Chicago*, 422 F.3d 611, 620 (7th Cir. 2005), and that the plaintiff's claim is thus either pretextual or exaggerated. Without that information, the jury will have a truncated view of the evidence as it relates to the causes and components of the claimed emotional distress, and its assessment of the plaintiff's version of events will be less than fully informed–the very evil the discovery rules were intended to eradicate.

The same reasoning applies to the claim that the plaintiff's career has been irreparably damaged and his request for damages for future lost compensation and benefits. (Complaint at 8, Relief Requested). One's career arguably cannot be irreparably damaged and future benefits lost if one cannot perform the essential functions of the employment position that provided the foundation of that career and on which future benefits depend. In short, the medical evidence sought by the University is relevant under Count I. It is also relevant under Count II.

## B.
## COUNT II AND THE MEDICAL RECORDS

Broadly phrased, the ADA's purpose is to eliminate discrimination in the workplace based on an affected individual's actual or perceived disability. 42 U.S.C. §§12101(a) and (b). The Act prohibits discrimination against a "qualified individual with a disability" because of that disability. 42 U.S.C. §12112(a). The term "qualified individual" is defined as an individual with a disability

---

[7] The appropriate curative is not prohibiting discovery, but employing a protective order that carefully limits the use to be made of the information. *Id.* But the ability to enter a sealing order obviously presupposes the relevance of the information.

who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or desires. 42 U.S.C.§ 12111(8). Disability is defined as: "[a] physical or mental impairment that substantially limits one or more of the major life activities of the individual, a record of such an impairment or being regarded as having such an impairment." 42 U.S.C. §12102(2). *See Murphy v. United Parcel Service*, 527 U.S. 516, 521 (1999); *E.E.O.C. v. Schneider National, Inc.*, 481 F.3d 507, 511 (7th Cir. 2007)(Posner, J.).

Count II tracks the statutory definition of disability; it is broadly and disjunctively phrased to charge the University with having discriminated against Professor Hodgdon on the basis of: his disability, record of his disability, or because he was regarded as having a disability. (Count II, ¶¶ 43-44). As phrased, the medical records are plainly relevant. *Timmons v. General Motors Corp,.* 469 F.3d 1122, 1127 (7th Cir. 2006).

To escape this inevitable result, the Reply brief claimed that Count II only charged the "regarded as having such an impairment" prong of the statute, not that Professor Hodgdon had an actual disability. (Reply at 3). Even if Count II as drafted were to be canalized within the narrow boundaries contended for by the plaintiff,[8] he must nonetheless be capable of performing the essential function of the job he holds or desires to prevail. *See* 42 U.S.C. §§ 12111(8) and 12112(a) and (b)(5)(A)-(B). The cases are uniform in holding that to make out a *prima facie* case of discrimination, whether based on an actual or perceived disability theory, a plaintiff must show: (1) that he suffers from a "disability"; (2) that he is qualified to perform the essential functions of the job in question, with or without reasonable accommodation; and (3) that he has suffered an adverse

---

[8] No request to amend the complaint has been made.

11

employment action as a result of his disability. *Katz v. City Metal Co.*, 87 F.3d 26 (1st Cir. 1996); *Timmons*, 469 F.3d at 1127. At a minimum, the medical evidence sought by the University is relevant to the second element. *Jackson v. City of Chicago*, 414 F.3d 806, 811-12 (7th Cir. 2005). Professor Hodgdon's argument that the complaint is based on the "regarded as having a disability" prong of the Act is thus beside the point.

The plaintiff's reliance on *Katz v. City Metal Co., supra*, is curious.[9] Apart from the fact that the defendant *was* apparently allowed discovery into the plaintiff's medical records, 87 F.3d at 29, the court of appeals held that even in a case based on the "regarded as having a disability" prong of the Act there must be proof that the plaintiff is qualified to perform the essential functions of the job in question, with or without reasonable accommodation. *Id.* at 33. *See also Dyke v. O'Neal Steel Inc.*, 327 F.3d 628, 633 (7th Cir. 2003).[10]

In sum, the medical records sought by the University are relevant to the pivotal question under Count II whether Professor Hodgdon is capable of performing the essential functions of the job he holds or desires.

---

[9] *Katz* was cited in the plaintiff's May 21, 2007 letter to the court in which, at my invitation, the plaintiff supplemented his opening and reply briefs. The University's counsel did the same in his letter of May 21, 2007.

[10] While the ruling here need not go so far, courts have found that ADA plaintiffs, like plaintiffs in an action for medical malpractice, waive all privileges and privacy interests related to their claim by virtue of filing the complaint. *See e.g., Butler v. Burroughs Wellcome, Inc.*, 920 F.Supp. 90, 92 (E.D.N.C. 1996); *Graham v. Casey's General Stores*, 206 F.R.D. 251, 254 (S.D.Ind. 2002);*Calder v. TCI Cablevision of Missouri, Inc.*, 2001 WL 991459, *1 (E.D.Mo. 2001).

## C.
## THE DEPAUL UNIVERSITY EMPLOYMENT RECORDS

This leaves the subpoena for Professor Hodgdon's DePaul University employment records.

The subpoena seeks production of:

> (1) ALL DOCUMENTS RELATING TO OR REFLECTING THE RECRUITMENT OR HIRING OF DANA H. HODGDON FROM 2004 TO THE PRESENT, INCLUDING BUT NOT LIMITED TO APPLICATIONS FOR EMPLOYMENT, CORRESPONDENCE, NOTES FROM INTERVIEWS, AND NOTES FROM INTERNAL DISCUSSIONS ABOUT WHETHER TO EXTEND AND OFFER. (2) ALL DOCUMENTS RELATING TO OR REFLECTING THE TERMS OR CONDITIONS OF DANA H. HODGDON'S EMPLOYMENT AT DEPAUL UNIVERSITY FROM 2004 TO THE PRESENT, INCLUDING BUT NOT LIMITED TO APPOINTMENT LETTERS, EMPLOYMENT CONTRACTS, SALARY INFORMATION, BENEFITS INFORMATION, AND ANY NEGOTIATIONS OR DISCUSSIONS REGARDING SUCH TERMS OR CONDITIONS. (3) ANY DOCUMENTS RELATING TO OR REFLECTING ANY DISCUSSIONS OR CORRESPONDENCE ABOUT THE POSSIBILITY OF DANA H. HODGDON BEING GRANTED MORE THAN A ONE-YEAR FACULTY APPOINTMENT (UP TO AND INCLUDING TENURE AT DEPAUL UNIVERSITY). (4) ALL DOCUMENTS REFLECTING DANA H. HODGDON'S EMPLOYMENT RESPONSIBILITIES AT DEPAUL UNIVERSITY FROM 2004 TO THE PRESENT, INCLUDING BUT NOT LIMITED TO JOB DESCRIPTIONS, CLASS SCHEDULES, LAB SCHEDULES, RESEARCH PROJECTS, COMMITTEE PARTICIPATION, AND ANY OTHER ADMINISTRATIVE RESPONSIBILITIES. (5) ALL DOCUMENTS RELATING TO OR REFLECTING DANA H. HODGDON'S PERFORMANCE AT DEPAUL UNIVERSITY FROM 2004 TO THE PRESENT, INCLUDING BUT NOT LIMITED TO PERFORMANCE EVALUATIONS BY SUPERVISORS, EVALUATIONS BY STUDENTS, AND ATTENDANCE RECORDS. (6) ANY DOCUMENTS RELATING TO OR REFLECTING ANY REQUESTS BY DANA H. HODGDON FOR LEAVE FROM 2004 TO THE PRESENT.

(*Plaintiff's Motion to Quash and For Protective Order*, at 5)(Capitalization in original).

Professor Hodgdon argues irrelevance, while the University contends that because the complaint explicitly alleged that he has not missed a single day of his teaching assignments at DePaul, he has placed his teaching record at issue. If that were the sole basis for the claim of relevance, the subpoena would be overbroad. But the University correctly notes that the complaint seeks damages for alleged lost wages and harm to his career. (*Defendant's Opposition to Plaintiff's Motion*, at 5). Actually, the complaint pointedly charges there has been *irreparable* harm not only to Professor's Hodgdon's career, but to *his reputation* as well. (¶ 36).

For professors no less than lawyers, reputation is fragile, and once lost, is not easily restored.

*Cf. People ex. rel. v. Culkin*, 248 N.Y. 465, 478 (1928)(Cardozo, C.J.). And it is that reputation which in part shapes one's very existence. "Am I not what I am, to some degree in virtue of what others think and feel me to be?" I. Berlin, Four Essays On Liberty, 155 (1969). Indeed, experience has taught that the dignity accorded an individual may depend as much on reputation as on actual merit. Judge Posner has said that at a minimum, reputation means "'widely regarded in a good light.'" Posner, Cardozo: A Study In Reputation, 58 (1990). And it is that regard which "facilitates [that individual] making advantageous transactions, commercial or otherwise. . . ." *Id.* at 59.

The DePaul records rather clearly relate to the allegation of irreparable harm to career and reputation. If the records show that Professor Hodgdon's performance at DePaul has been lustrous, that evidence would arguably support a claim that Professor Hodgdon's career and reputation have been unaffected. Conversely, if the information reveals difficulties in performance, it would be relevant to the question of whether Professor Hodgdon was capable of performing in accordance with Northwestern's legitimate job requirements and to the root cause of any diminution in career prospects and reputational injury. Of course, it is for the jury to determine what use can be made of the information if, in fact, it is brought to their attention. But the information *is* relevant to the questions raised in the complaint and which the jury will be called upon to decide.

Finally, for the reasons discussed in connection with the medical records, the DePaul records are relevant. While certain aspects of the subpoena touch the periphery of relevance (*i.e.*, notes from interviews, notes from internal discussions, documents reflecting negotiations), it cannot be said that they might not lead to admissible evidence. *See* 9A Wright, Miller & Cooper, *Federal Practice and Procedure* § 2459, at 44-45 (2d. ed.1994) (explaining that the scope of production under a subpoena is coextensive with the limitations of scope prescribed in Rule 26(b)(1)).

14

## CONCLUSION

For the foregoing reasons, the plaintiff's motion to quash and for a protective order [#28, 31] is DENIED.

ENTER: _____
UNITED STATES MAGISTRATE JUDGE

DATE: May 29, 2007